UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ALABAMA EDUCATION ASS'N, *et al.*, DELAWARE FEDERATION OF TEACHERS, *et al.*,<br><br>      Plaintiffs,<br><br>    v.<br><br>ELAINE L. CHAO, Secretary, U.S. Department of Labor, in her official capacity,<br><br>      Defendant,<br><br>**(Consolidated Cases)** | Civil Action No. 03-253 (RMC)<br>Civil Action No. 03-682 (RMC) |

**MEMORANDUM OPINION**

After 40 years of a consistent interpretation of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq.* ("LMRDA"), that excluded all public sector unions from its coverage, the Department of Labor ("DOL") changed its mind. The D.C. Circuit Court of Appeals held that DOL had failed to give a reasoned explanation for its sudden change of heart. *Ala. Educ. Ass'n v. Chao*, 455 F.3d 386 (D.C. Cir. 2006). On remand, DOL defends a new Policy Statement[1] as providing that reasoned explanation against challenges advanced by the Alabama Education Association and other State Education Associations ("SEAs") and the Delaware Federation of Teachers and other State Federations of Teachers ("SFTs"). The challenges raise serious issues and might convince the Court, were it the decisionmaker. The Court's role, however,

---

[1] *See* 72 Fed. Reg. 3735 (Jan. 26, 2007); 2007 WL 186395 (F.R.).

is much more limited: if the Secretary presents a reasoned analysis for her choice between two permissible interpretations of a statutory ambiguity, her policy choice must be upheld. That is the situation here.

The LMRDA requires labor unions to file extensive financial reports annually with DOL. Excluded from this and other statutory requirements is "[a] labor organization composed entirely of employees of the governmental entities excluded by section 3(e)." 29 C.F.R. § 451.3(a)(4) (2008). As a result, public sector unions at all levels have been free of LMRDA obligations since the statute was adopted in 1959. In October 2003, the Secretary read a decision of the Ninth Circuit, *Chao v. Bremerton Metal Trades Council, AFL-CIO*, 294 F.3d 1114 (2002), as giving her authority to expand the coverage of the LMRDA to intermediate-level public sector unions that are affiliated with national unions composed, in part, of private sector employees, regardless of whether the intermediate union is composed solely of public sector employees. Rebuffed by the D.C. Circuit because *Bremerton* was being mis-read, the Secretary reconsidered and "determined that the purposes of the LMRDA are better served by basing coverage . . . on the fact that the intermediate labor organization is under the jurisdiction and control of another labor organization covered by the Act." *See* Secretary's Mem. in Opp'n to Pls.' Second Mots. for Summ. J. ("Sec.'s Opp'n") [Dkt. #50] at 2. After all, "it is difficult to understand what practical objections could be lodged against the adoption of a policy that increases labor organization reporting and disclosure." *Id.* at 3.[2]

---

[2] The irony of this argument must be noted. The Plaintiff SEAs and SFTs present multitudes of "practical objections" to the expansion of LMRDA coverage to them and if the question were one to be based on practical objections, they would clearly win this suit. That, however, is not the question. The only question is whether the Secretary has provided a reasoned explanation for her new interpretation of the law.

## I.  BACKGROUND FACTS

This case is again before the Court on summary judgment cross motions, this time in light of (i) the Court of Appeals' intervening decision remanding the matter to the DOL for a reasoned explanation of the DOL's 2003 decision to change its interpretation of § 3(j)(5) of the LMRDA; and (ii) the DOL's subsequent issuance of a "Policy Statement; Interpretation."

LMRDA § 3(i) provides that for LMRDA purposes:

> "Labor organization" means a labor organization engaged in an industry affecting commerce and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization, other than a State or local central body.

29 U.S.C. § 402(i). The Second Clause is at issue in this case.  Section 3(j)(5), 29 U.S.C. § 402(j), which is a companion definition clause to the Second Clause, provides that "[a] labor organization shall be deemed to be engaged in an industry affecting commerce" if it --

> is a conference, general committee, joint or system board, or joint council, subordinate to a national or international labor organization, which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection, other than a State or local central body.

29 U.S.C. § 402(j)(5).[3]  From the outset, DOL interpreted these provisions to exempt conferences,

---

[3]  The Court agrees with the Secretary that this listing is illustrative only.  *See Harrington v. Chao*, 372 F.3d 52, 59 (1st Cir. 2004) (referring to the listing in Section 3(i) as "illustrative"); *see also* 29 C.F.R. § 451.4(f); 28 Fed. Reg. 14,389 (Dec. 27, 1963); 42 Fed. Reg. 59,071 (Nov.

etc., composed entirely of public sector local unions, although subordinate to a national or international union that was covered by the LRMDA, such as, in this case, the National Education Association ("NEA") and the American Federation of Teachers ("AFT").

In October 2003, DOL announced that it was changing its interpretation of § 3(j)(5) to bring it into line with "the holding of the U.S. Court of Appeals for the Ninth Circuit in *Chao v. Bremerton Metal Trades Council, AFL-CIO*, 294 F.3d 1114 (2002)." *See* 68 Fed. Reg. 58,374, 58,383-84 (Oct. 9, 2003). Under the changed interpretation, all purely public sector intermediate conferences, etc., that are subordinate to a covered national or international union that includes a private-sector local union became LMRDA-covered labor organizations. *See id.* at 58,38384.

When the SEAs and SFTs challenged the new regulation, this Court held that DOL's changed interpretation was impermissible because it was contrary to the plain meaning of the statute and its legislative history and purpose. *See* Mem. Op. [Dkt #35]. On appeal, the D.C. Circuit stated that, although "the SEAs and the SFTs well may have the better reading of the statute," the question was a "close" one that was not properly before the Court. *See Ala. Educ. Ass'n*, 455 F.3d at 396. That was so because "from a purely grammatical standpoint" the DOL's changed interpretation of § 3(j)(5) is a permissible one, and "we have made clear that an agency's interpretation of a statute is entitled to no less deference [under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984)] simply because it has changed over time." *Id*. (internal quotations omitted). "Rather," said the Court of Appeals, "the question raised by the change [in interpretation] is whether the Department has supported its new reading of § 3(j)(5) with a 'reasoned analysis' sufficient to command our deference under *Chevron*." *Id.* Such a reasoned analysis was missing because

---

15, 1977).

> [i]n responding to comments submitted by the NEA and the AFL-CIO, the Department relied upon the Ninth Circuit's decision in *Bremerton*, but did not acknowledge or seem to realize that the court there did not face the question at issue here, that is, whether a body that does not represent statutory "employees" or deal with statutory "employers" may be subject nonetheless to the LMRDA. For the Department to claim it revised its reading of § 3(j)(5) in order to "adopt the . . . 'holding' of *Bremerton*," 67 Fed. Reg. at 79,284, therefore, does not contribute anything toward the reasoned analysis required of it.

*Id.* at 397. Accordingly, the Court of Appeals reversed the grant of summary judgment to the SEAs and SFTs, but remanded to DOL to provide the necessary reasoned analysis.

On January 26, 2007, DOL published a Policy Statement in the Federal Register "in response to the remand order." Policy Statement, 72 Fed. Reg. 3735 (Jan. 26, 2007); 2007 WL 186395 (F.R.). The Secretary adhered to the position first articulated in October 2003 and determined that the clause, "which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection," in § 3(j)(5), "modifies 'national or international labor organization'" and not "'conference' and other listed intermediate bodies." *Id.* ("The Department's LMRDA Rulemaking"). The result of DOL's re-asserted interpretation "is that intermediate bodies that are subordinate to a national or international labor organization that includes a covered labor organization will be covered by the LMRDA, even if the intermediate body is composed of solely public sector local labor unions not covered by the Act." *Id.* ("Explanation for the Department's Revised Interpretation of Section 3(j)(5)"). DOL gave three reasons for its interpretation.

> First, the Department has selected a policy alternative that is consistent with the terms of the statute and promotes Congress's purposes in enacting the LMRDA . . .[by]

> advanc[ing] the twin Congressional goals that labor organizations' financial conditions and operations should be subject to public disclosure to benefit employees[4] that participate in those organizations, and that the definition of "labor organizations" covered by the LMRDA should be interpreted broadly to advance union democracy, financial transparency, and integrity.
>
> Second, the expanded coverage . . . promotes disclosure of financial disbursements and receipts to and from structurally related labor organizations, thus enhancing employees' ability to understand the overall operation of labor organizations in general, as well as identify any potential financial irregularities in particular [because modern unions are larger and more complex than their forebears].
>
> Third, and most importantly, . . . [t]he interpretation advances public disclosure of financial transactions by intermediate bodies that receive money from covered national and international labor organizations, the source of which is, in part, fees and assessments originating from employees in the private sector. Thus, the so-called "wholly public sector" intermediate body loses that attribute to a great extent (despite its composition) when it is subordinate to, and accepting contributions from, covered national and international labor organizations whose funds are derived, in part, from employees in the private sector.

*Id.* Expanding on its third rationale, DOL stated that its changed interpretation serves to "correct[] a problem," left unattended "[f]or several decades" by its original interpretation. *Id.* "[T]he problem" posited by DOL is that

> [i]n some cases, private sector employees are represented by a local union that financially supports a national or international labor organization with which it is affiliated, and that national or international labor organization in turn financially supports a subordinate state-level labor body that may itself be wholly composed of locals representing employees only in the public sector and therefore, has not,

---

[4] The "employees" to whom DOL refers are wholly in the private sector.

>in the past, filed annual financial disclosure statements.
>
>. . . Consequently, the private-sector [employees] can track expenditures of their local union dues [by the national or international union] only until the expenditures reach the state-level labor organization.  There, under the Department's prior interpretation, further financial information would not be available, because the intermediate labor organization would not be considered to be engaged in an industry affecting the Act and would not be required to file reports.

*Id.* DOL also expressed concern that the prior interpretation permitted "LMRDA-covered national and international organizations to make financial disbursements to their intermediate affiliates without any requirement that the intermediate affiliates disclose the manner in which that money, some derived from private-sector employees, was spent.  Private-sector local union members [thus] have been unable to ascertain whether their representatives spend their money wisely, foolishly, or even illegally." *Id.*

The Plaintiffs challenge each of these rationales.  *See* Pls. Delaware Fed'n of Teachers, *et al.*, Second Mot. for Summ. J. ("SFT Mem.") [Dkt. #44]; *see also* Pls. State Educ. Assocs.' Second Mot. for Summ. J. ("SEA Mem.") [Dkt. #42].

## II.  LEGAL STANDARDS

### A.  Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine which facts are "material"

a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id*.

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if she "supports[s] h[er] allegations allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006). Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Greene*, 164 F.3d at 675.

## B. Legal Standard for Judicial Review of Agency Interpretation of Statutes

The Supreme Court set forth a two-step approach to determine whether an agency's interpretation of a statute is valid under the APA. *Chevron*, 467 U.S. at 842. This approach, commonly referred to as "*Chevron* deference," requires the court to first look to "whether Congress has spoken to the precise question at issue." *Id.* If so, the court ends its inquiry. *Id.* But, if the statute is ambiguous or silent, the second step requires the court to defer to the agency's position, so long as it is reasonable. *Id.* at 843.; *Sea-Land Servs., Inc. v. Dep't of Transp.*, 137 F.3d 640, 645 (D.C. Cir.1998) (holding that "[*Chevron*] deference comes into play of course, only as a consequence of statutory ambiguity, and then only if the reviewing court finds an implicit delegation of authority to the agency"). In applying *Chevron*, the Supreme Court has held that "[a]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). Indeed, "judgment about the best regulatory tools to employ in a particular situation is . . . entitled to considerable deference from the generalist judiciary." *W. Union Int'l v. Fed. Commc'ns Comm'n*, 804 F.2d 1280, 1292 (D.C. Cir. 1986).

## III. ANALYSIS

DOL first asserts that its expansion of LMRDA coverage is consistent with "the tenet that the statute should be read broadly to include all labor organizations within its ambit unless they are expressly excluded from the Act." Sec.'s Opp'n at 9. In other words, since Congress thought that detailed financial reporting would keep union leaders honest and inform employees, the more

union leaders who have to file reports, the more honesty and available information. The SFTs respond that this rationale is unsupported by facts showing that DOL's prior interpretation was deficient or that the new interpretation will better serve the purposes of the Act. SFT Mem. at 14.

The SFTs' argument misapprehends the status of this litigation. While this Court thought the meaning of the LMRDA plain, the D.C. Circuit agreed with DOL that there are two permissible interpretations of the law. Once there is more than a single interpretation that is permissible, the Secretary may select between or among them as long as she provides a "reasoned explanation" for her choice. She does not need to demonstrate that her prior interpretation was "wrong" or deficient in some way; she only needs to give a sensible reason for the change in interpretation. And it is difficult to argue against the proposition – which is the thrust and congressional purpose behind the statute – that if detailed financial reports will keep leaders honest and help those they lead to choose their leaders, the more the merrier.

Secondly, DOL states that modern unions are more complex and bureaucratic than the small independent unions of the past and that more financial reporting is thus a positive change for private sector employees. The Plaintiffs dispute the accuracy of this statement and, indeed, the Court finds that this part of the Policy Statement is almost entirely a make-weight. The asserted complexity of union structures that might confuse an individual private sector employee is not likely to be made less opaque by additional dense financial filings with DOL.

Third, and most critically, DOL says that its changed interpretation will allow a private sector employee – such as a member of the Professional Guild of Ohio, Local 1960 – to trace her dues as some of it is sent to the American Federation of Teachers ("AFT") and thence to the Louisiana Federation of Teachers. Or a member of the Milton Hershey Education Association might

trace his dues as some of it is sent to the National Education Association ("NEA") and then to the Wyoming Education Association. The Plaintiffs contend that this rationale is totally unrealistic in practice. The AFT, for instance, sent a single $15,000[5] grant to the Louisiana Federation of Teachers in 2005 and no money elsewhere to any other intermediate-level union. Thus, the member of the Professional Guild could not actually trace her dues. Most of the dues collected by AFT is from public sector employees and the aggregation of dues at the national level reduces any private sector employee's contribution to the *de minimus* level. As to the NEA, it distributes greater amounts to the SEAs but declares that it will set aside monies from private sector employees and not distribute them; this assertedly will address the Secretary's concerns. Both sets of Plaintiffs note that the Secretary has failed completely to introduce information from other public sector unions that also have intermediate organizations and whether this alleged problem of secrecy exists there as well, although the changed interpretation will assuredly apply.

What the evidence reveals is that the AFT and the NEA have the authority to use dues monies collected from private sector employees for disbursements to intermediate organizations made up of wholly public sector unions. Whether the amounts in question are *de minimus* in any given year does not detract from the fact that such uses of dues from private sector employees are permissible and might, in another year, be more significant.

Whether the Secretary is hitting a gnat with a hammer is not for this Court to say. The policy choice is hers to make. Without doubt, some of the monies the AFT and NEA collect come from the dues of private sector employees. After that, both AFT and NEA can, if either chooses, disburse some of that dues money to public sector intermediate organizations. The

---

[5] AFT believes this figure is inaccurate.

Secretary states that she is furthering the congressional goal of financial visibility and allowing a private sector dues-paying employee to trace her dues up to NEA or AFT and then to an intermediate public sector organization and, with new reporting, to whatever expenditures the intermediate organization makes. With the deference that is due under *Chevron*, this Court cannot say that the Secretary has failed to provide a reasoned explanation for her change of statutory interpretation.

### IV. CONCLUSION

Summary judgment will be granted to the Secretary. A memorializing order accompanies this Memorandum Opinion.

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

DATE: March 27, 2008